IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

GREGORY MICHAEL EUGENE MAYFIELD                          PLAINTIFF

V.                          CASE NO. 3:20-CV-03007

SERGEANT ETHAN RAYMOND, formerly, Jailer
Ethan Raymond, Baxter County Detention Center;
SERGEANT STEVEN GOODE;
SERGEANT CLAY MAPLE;
and CHIEF DEPUTY LEWIS                                   DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

This is a civil rights action filed by Plaintiff Gregory Mayfield pursuant to 42 U.S.C.

§ 1983.   Mayfield proceeds *pro se* and *in forma pauperis.*   He maintains that while he

was incarcerated in the Baxter County Detention Center ("BCDC"), his constitutional

rights were violated in the following ways: (1) excessive force was used against him by

Jailer Raymond[1] on two occasions; (2) Defendants failed to protect him from attack by

fellow inmates and from attack by Jailer Raymond; (3) he was retaliated against; and (4)

he was subjected to unconstitutional conditions of confinement.

Pending before the Court is a Motion for Summary Judgment (Doc. 21) filed by

Defendants.   Defendants have filed two Supplements at the request of the Court (Docs.

37 & 38).   Mayfield filed a Response (Doc. 26) and two Supplemental Responses (Docs.

32 & 35).   The Summary Judgment Motion is ready for decision.

---

[1] While Ethan Raymond is currently a Sergeant, he was a jailer at the time of the events
at issue in this case.   Therefore, the Court will refer to him throughout as Jailer Raymond.

1

## I.      BACKGROUND

Mayfield was booked into the BCDC on November 9, 2019, on pending criminal charges and a petition to revoke his suspended sentence.   (Doc. 23-1 at 5 & 7).   He remained incarcerated there until February 7, 2020.   (Doc. 38-2 at 6).

Chief Deputy Lewis is directly under the sheriff and assists in running the sheriff's office, which includes a patrol division, a criminal investigation division, a civil division, a courthouse security division, and a detention center.   (Doc. 23-1 at 1).   The responsibilities for most day-to-day tasks are delegated through a chain of command. *Id.*   The detention division is headed by the jail administrator.[2]   *Id.*   "[O]fficers are expected to perform those day-to-day tasks pursuant to the policies the Sheriff had implemented for the department."   *Id.*   According to Chief Lewis, the "chain of command, in addition to other mechanisms like camera systems, post-incident investigations, grievance procedures, and other mechanisms, also provides for the comprehensive supervision of jail employees."   *Id.*

On November 19, 2019, Jailer Raymond wrote the following in Mayfield's comments log:

> This inmate was found naked in the A-Pod shower covered in vomit and blood from his nose.   Both of his eyes appeared to be swollen and turning purple and he had red marks along his legs and chest.   Other inmates in the pod advised that he fell in the shower but this inmate[']s injuries make it appear that he was the victim of a beating.   When asked questions inmate Mayfield only mumbled or groaned.
>
> This inmate was placed in the restraint chair and wheeled up front in booking and an ambulance was called.

---

[2] The jail administrator is not identified.

2

*Id.* at 15.

Nurse Sierra Hollis wrote in her notes that Mayfield appeared to be unconscious. *Id.* He had a small laceration on his left knee, small abrasions on his right knee, and bruising and swelling of both eyes. When she asked him simple questions, Mayfield appeared unable to answer except with a moan. She determined that he should be taken to the hospital. Hospital records indicate that Mayfield was seen by hospital staff and then discharged back to the BCDC with directions to follow-up with an ear, nose, and throat specialist, Dr. Monty Barker, and with his primary care physician, Dr. Michael Adkins. *Id.* at 46–48. Mayfield was given a prescription for Augmentin and advised to take ibuprofen for pain. *Id.* at 47. He was first returned to A-pod, but Nurse Hollis asked that he be moved to the "detox cell" at the front of the jail. *Id.* at 15.

Chief Lewis's first encounter with Mayfield was on November 21, 2019, when Lewis happened to be at the jail and was handed a grievance written by Mayfield complaining "about a lack of running water and toilet." *Id.* at 2. Chief Lewis verified with jail staff that Mayfield had "access to running water and a functioning toilet and responded in kind."[3] *Id.* On the same day, a note was entered in the jail log that Mayfield could no longer stay in "detox" with Inmate Brown because Brown had a problem with him. (Doc. 23-1 at 14). It was determined that Mayfield could be moved to H2 or B-pod. *Id.* Mayfield could not be placed in H1 because Mayfield had stated he would fight Inmate

---

[3] Defendants were asked to provide the Court with any documents indicating that plumbing repairs had been made in November or December of 2019. Apparently, none exist for November or December 2019, as all documents submitted are invoices dated from March 2020 to October 2020 and none reference work done during the months of November or December 2019. (Doc. 38-1 at 1–11).

3

Sallee, who was housed there.   *Id.*   Mayfield was then placed in H2, but he told jail staff that he would start fighting the other inmates in that pod.   *Id.*   He was moved to B-pod where he claims he was "jumped and beat and drug to the door."   *Id.*   At that point, Inmate Sallee was moved to another cell, and Mayfield was placed in H1 by himself.   *Id.*

On November 23, 2019, Mayfield submitted a grievance.   *Id.* at 24.   He stated that he had not had recreation or a newspaper for six days and had to "beg" for his showers and medication.   *Id.*   He also noted that he had not seen sunlight for six days. The last two sentences of the grievance are illegible.   *Id.*

Chief Lewis's second encounter with Mayfield occurred on November 25, 2019. *Id.* at 2.   The jail nurse told Chief Lewis that Mayfield was kicking and banging on the door and would not stop.   Chief Lewis went to the jail, and he and several officers approached Mayfield's cell.   Mayfield was lying on his back on the floor kicking the door with both feet.   One of the officers pointed a taser at Mayfield and ordered him to get up and get into the restraint chair that had been brought to the cell.   Mayfield complied and was peacefully placed into the restraint chair.   Chief Lewis' understanding was that Mayfield spent a little over an hour in the restraint chair and then was returned to his cell.

The Defendants submitted a video of Mayfield being placed in the restraint chair. The video begins at approximate 9:48:38 and shows an empty restraint chair being wheeled past the booking bench with five officers initially appearing on the video followed shortly by two additional officers.   The chair is rolled into an adjacent room with a window, and the door is propped open.   The video contains the following images:

> 9:49:05 Mayfield is brought directly into the room with his hands on his head. Mayfield sits down in the restraint chair, and various officers begin strapping him

into the chair.   Although there are times when Mayfield's entire body is not in view, at no time is any officer seen using physical force against Mayfield.

9:50:38 Mayfield is wheeled out of the room, and the chair is placed in front of the booking bench.   Mayfield's arms are strapped down, and there is a strap around his waist.   The shoulder straps are not fastened, and officers examine the straps but appear unable to fasten them.   The straps are simply laid over Mayfield's shoulders.

9:52:01 The chair is rolled away from the booking bench and to the lower left of the screen.   A telephone is wheeled through the room.

9:53:45 Mayfield is moved closer to the booking bench, and his entire body can be seen.   Mayfield appears to be talking.   Various officers and inmates walk through the area.   Nothing noteworthy happens for a significant time.

10:38:20 Mayfield crosses his feet, making it clear that no straps restrain his leg movement.

10:40:08 An officer removes the straps from Mayfield's wrists.   At this point, he is only restrained at the waist.

10:41:24 The waist strap is removed.   Mayfield is given a tray of food and goes back into the pod.   The video ends.

Chief Lewis's third encounter with Mayfield occurred on November 27, 2019. (Doc. 23-1 at 2).   Chief Lewis was advised that Mayfield was moved back into A-pod, where he had previously been attacked.   *Id.*   Chief Lewis "immediately advised Sgt. Steven Goode that Mr. Mayfield should be moved out of A- Pod and up to the holding cells in the front for his own safety."   *Id.*   He claims that he "consistently instructed jail staff to follow county policy and keep Mr. Mayfield separated from inmates who we believed might present a risk to his safety."   *Id.* at 3.

On December 7, 2019, Mayfield lodged a grievance about the conduct of Jailer Raymond.   *Id.* at 27.   Mayfield indicated that he flooded his own cell because he had not had a shower in four days.   Jailer Raymond removed Mayfield from his cell and

handcuffed him to a bench.   Mayfield contends that he was then placed in the restraint chair and moved into the change-out room where he was told, with expletives, to shut his mouth.   *Id.*   Mayfield admits that he, too, was screaming and using expletives.   *Id.*   However, he maintains that his right-hand restraint was too tight, which caused him to be unable to feel his hand.   *Id.* at 28.   Mayfield indicates that after his restraint chair was placed in the change-out room, he was still able to wiggle around in the chair and push the door open a bit.   Mayfield claims that Jailer Raymond pushed him back into the room and "punched me in the right side of my head."   *Id.*   According to Mayfield, he developed a "huge knot" on the side of his head and asked various guards to feel the knot so that he would have a witness.[4]   *Id.*   Mayfield submitted a medical request on December 7, 2019, stating that he had a bruise on the right side of his face from when he was punched while in the restraint chair.   (Doc. 37-1 at 3).

Defendants have provided two video clips covering the December 7, 2019 incident. (Doc. 36).   The camera in the first video (designated "ch 15") looks down a hallway that includes the booking area, which is surrounded by a chest-high divider topped with a shelf.   Further down the hallway, there is a bench.   The following events are captured on the video:

> 13:56:34 Mayfield is led in with his hands on his head and appears to be talking the entire time.   He sits on the booking bench and puts his hands on the wall behind him. Jailer Raymond then takes Mayfield's right wrist and

---

[4] Mayfield offered a statement from Inmate Mathew Braden to corroborate Mayfield's claim that he asked jail personnel to feel the side of his head.   (Doc. 26 at 5).   However, the statement was not sworn before a notary or made under penalty of perjury. Therefore, the statement may not be considered on summary judgment.   *See Banks v. Deere*, 829 F.3d 661, 668 (8th Cir. 2016) (statements that are neither sworn nor made under penalty of perjury may not be considered on summary judgment).

handcuffs it to the bench.

13:56:46 Jailer Raymond walks out of camera view; Mayfield continues talking and gesturing.

13:59:43 Mayfield slides down the bench, reaching for another handcuff that is secured to the bench.   Mayfield attempts to secure his left wrist to that handcuff.

14:00:20 Mayfield manages to get his left wrist into the handcuff and closes it.

14:02:00 Mayfield continues talking and also appears to be singing; he is rocking his body and tapping his feet.

14:03:17 The restraint chair is wheeled into view. Mayfield is uncuffed and moved to the restraint chair. Mayfield's wrists, waist, shoulders, and ankles are secured with straps.

14:05:27 The door to what is referred to as the change-out room, located at the lower left of the screen, is opened, and Mayfield is wheeled into the room, which does not have a window. Jailer Raymond exits the room.

14:16:49 Jailer Raymond returns and opens the door to the room where Mayfield is located.   He enters the room.

14:17:11 Jailer Raymond exits the room and closes the door.

The door to the change-out room is not opened again, and the tape ends at 14:41:56.

The next video (designated "ch 1") shows a different view from the other end of the hallway:

13:56:23 Mayfield is led through the door at the far back of the screen; he places his hands on his head.

13:56:36 Mayfield walks out of sight of the camera at the front of the screen. Jailer Raymond passes through a gate into the area used by the booking officers.

14:03:08 The restraint chair is wheeled through the door at the far back of the screen.   The chair is then wheeled towards the front of

7

the screen until only the top portion of the back of the chair and the two handles are visible.

14:04:00 Mayfield's head is visible as he takes a seat in the chair.

14:05:35 Jailer Raymond opens the door to the change-out room and wheels Mayfield into the room.

14:05:40 Jailer Raymond exits the change-out room and closes the door.

14:06:29 The door to the change-out room partially opens from the inside.

14:08:01 A female jailer walks into the booking area with two female detainees, one of whom has an injury to her arm. The door to the change-out room is still partly open.

14:09:57 Jailer Raymond returns to the booking area.

14:10:39 Jailer Raymond gestures to another officer to close the door of the change-out room.

14:16:50 Jailer Raymond enters the change-out room.

14:17:10 Jailer Raymond exits the room and closes the door.

14:48:59 Jailer Raymond goes to the door, opens it, looks in, and shuts the door.

14:55:00 The video ends, and the change-out room door is not opened again.

(Doc. 36).

By affidavit, Jailer Raymond offers the following account of the December 7, 2019

occurrence:

Mr. Mayfield had to be placed in a restraint chair after he flooded his cell.   I wheeled him to the booking area, but he was being far too loud, so I wheeled him into the "change-out room," where new detainees change into their jail uniforms.   Because of its normal function, there is no camera in that room and no windows on the door, so I left the door slightly cracked.   After those

8

events, when Mr. Mayfield was placed back in a cell, he apparently told my Sergeant that I had struck him and threatened him in the change-out room. I denied the accusations then and I deny them now, because this did not happen.

(Doc. 23-2 at 1).

By affidavit, Sergeant Goode indicates that Mayfield did "tell me that [J]ailer Ethan Raymond had assaulted and/or threatened him, although he was unable to show me any physical bruising, scrapes, or other marks of any physical assault."   (Doc. 23-3 at 1–2). Nevertheless, Sergeant Goode spoke to Jailer Raymond, who denied any assault or threat.   *Id.* at 2.   While Sergeant Goode "tended to believe [J]ailer Raymond," he "still had a talk with him, reminding him that such behavior, if it occurred, would violate county policy and would not be tolerated."   *Id.*

Sergeant Maple indicates in his statement that he was not working at the jail on December 7, 2019.   (Doc. 23-4 at 1).   However, he recalls that at some point after that date, "Mayfield did tell me that [J]ailer Raymond had assaulted and/or threatened him." *Id.*   Sergeant Maple claims he "discussed the accusation with Sgt. Goode.   Sgt. Goode told me that he had already handled the matter.   Since it occurred on his shift and since we are the same rank, I proceeded no further and went back to other duties."   *Id.* at 2.

Mayfield submitted a grievance dated December 7, 2019, in which he complained about the incident involving Jailer Raymond and threatened to sue if nothing was done about it.   (Doc. 23-1 at 28).   In response, Mayfield was told that Jailer Raymond "was given verbal warning about treatment of inmates and was instructed to read policy."   *Id.* at 27.

Mayfield then submitted a grievance dated December 10, 2019, in which he asked

9

for copies of the incident reports from November 25 and December 7, 2019.[5]   (Doc. 1 at

9).   He also indicated that he needed "those Grievances returned."   *Id.*   In response, he

was told, "Here are your grievances.   I don't see incident reports."   *Id.*

On December 12, 2019, Mayfield was involved in a fight with Inmate Anderson.

(Doc. 23-1 at 17).   Jailer Radcliff and Jailer Raymond responded to a disturbance in cell

G4.   *Id.*   They observed

> Inmate Mayfield pacing the cell with his shirt off and Inmate Anderson sitting
> on the bottom bunk.   Both inmates appeared out of breath and were
> breathing heavily.   Inmate Mayfield appeared to have light red marks
> across his torso and arms and was visibly angry and admitted to jail staff
> that he attacked Inmate Anderson and that if we put anyone else in his cell
> that he will beat them too.   *Id.*

Anderson was removed from the cell.   *Id.*   Contraband was found in the cell.   *Id.*

There was also writing on the cell wall, and Mayfield was in possession of a "metal screw

tied to a soap bottle."   *Id.*   Mayfield admitted to doing some of the writing on the cell wall

and refused to admit where he got the metal screw.   *Id.*   He was charged with impairing

operations of a vital facility and obstructing governmental operations.[6]   *Id.*; *see also* Doc.

38-2 at 1–2, 8.

On December 13, 2019, Mayfield tendered a general request to jail staff.   (Doc.

23-1 at 31).   He stated that he would like to press charges on "someone."   *Id.*   He also

---

[5] The grievance dated December 10, 2019 that was submitted by Defendants contains
the date November 24, 2019, rather than November 25, 2019.   (Doc. 23-1 at 29).

[6] Mayfield also alleges in claim two of his Complaint that Jailer Raymond wrongfully
charged him with a violation of Ark. Code Ann. § 5-54-105 for hindering apprehension,
prosecution, conviction, or punishment of another.   (Doc. 1 at 5).   No other mention of
this alleged wrongful charge appears in the record.

indicated that he was filing a lawsuit "due to retaliation & den[y]ing me my rights."   *Id.*  No response was written on the form.   *Id.*   Following this, Mayfield submitted several grievances stating that he wanted copies of his grievances from November 24 and November 25, 2019, which were missing.   *Id.* at 32–35, 37; *see also* Doc. 1 at 13, 17, 19.

With respect to Mayfield's requests for copies of grievances, Sergeant Goode claims that he provided them to Mayfield on several occasions, but Mayfield kept losing them.   (Doc. 23-3 at 2).   At some point, Sergeant Goode states that he "did say something to [Mayfield] about having his lawyer request the grievances."   *Id.*

On December 17, 2019, Mayfield submitted a grievance claiming that his Eighth Amendment rights had been violated.[7]   (Doc. 1 at 19).   In response, he was asked which part of the Eighth Amendment he was being denied.   *Id.*   Mayfield submitted another grievance that day asking for copies of all grievances he had submitted.   (Doc. 23-1 at 33).   He indicated that he was missing his grievance from November 24, 2019, and asked why only some of his grievances which were "unsigned" were being returned to him.   *Id.*

On December 19, 2019, Mayfield submitted a grievance indicating that he wanted to "re-report that on 11-24-19 I was ass[a]ulted on camera & my life was threatened by

---

[7] This grievance was attached to the original Complaint.   When considering a summary judgment motion, the allegations of a verified complaint must be believed, "as they are evidence to the same extent as statements in a sworn affidavit."   *Munz v. Michael*, 28 F.3d 795, 798-99 (8th Cir. 1994).   For this reason, the Court will consider the allegations of both the original Complaint (Doc. 1) and the Amended Complaint (Doc. 11), as well as the attached exhibits.

Ethan Raymond.   Nothing has been done about this & I want to know why."   (Doc. 23-1 at 36).   No response was noted on the grievance.   *Id.*   That same day, Mayfield again requested his missing grievances from November 24 and 25, 2019.   (Doc. 1 at 13).   He also asked to be allowed to press charges.   *Id.*   In response, he was given a copy of his grievance from December 7, 2019.   *Id.*   Defendants' exhibits contain two additional grievances dated December 19, 2019, in which Mayfield sought copies of the grievances from November 24 or 25, 2019.   (Doc. 23-1 at 34–35).   No response is contained on either of these grievances.   *Id*

On December 22, 2019, Mayfield submitted a grievance asking why "the people I'm suppose[d] to trust to protect me are allowed to hurt me with no harsh punishment for ass[a]ult.   When I asked to press charges & been denied.   If I had hurt him twice I'd be in prison not given a verbal warning."   (Doc. 1 at 18).   No response is contained on the grievance.   *Id.*

Mayfield submitted grievances on December 23 and 24, 2019, again asking for copies of his grievances from November 24 and 25, 2019.   (Doc. 1 at 16–17).   In response, he was told the original grievances were handed back when they were answered.   *Id.* at 16.

On December 25, 2019, Mayfield submitted a grievance stating that he had asked the day shift at the jail "for law library" time and did not get it.   (Doc. 23-1 at 38).   In response, he was told that he needed to ask for the law library at a "decent hour" and had been advised of this before.   *Id.*   He was also told that he would be taken to the law library on Friday or Saturday night if he did not go before then.   *Id.*

12

On December 26, 2019, Mayfield covered the camera in his cell.   (Doc. 38-2 at 3).   Also, he apparently removed insulation from around his cell window.   *Id.*   Jailer Raymond issued him a citation for impairing the operation of a vital facility and obstructing government operations.   *Id.* at 5.

On January 4, 2020, Mayfield submitted another grievance, which is barely legible. (Doc. 23-1 at 39).   In this grievance, Mayfield claimed that he had asked for cleaning supplies and not been given them.   He also complained that his pills were given to him late and that he had not been able to go the law library.   Using profanity, he asked that the jailers do their jobs.   In response to this grievance, Mayfield was told that cleaning carts are sent around daily and that no jailers had reported Mayfield requesting anything that day.   He was also advised to watch his language and that the jail staff could not control when he decided to "throw a fit."   *Id.*   Finally, Mayfield was asked to refrain from telling jailers to do their jobs.   *Id.*

Mayfield lodged another grievance on January 5, 2020, concerning the December 7, 2019 incident involving Jailer Raymond.   (Doc. 23-1 at 40).   When he was asked how the issue could be resolved, Mayfield responded: "FREEDOM! & JUSTICE."   *Id.*

In reply, Mayfield was told:

> You flooded your cell and you were removed for your safety and cuffed for our safety and yours.   You were placed in the chair and room because you were being verbal[l]y and physically abusive toward staff.   All grievances have been returned to you.   Your 8th Amendment was not violated.   I hope you are not making threats toward staff, that could be considered a major infraction.

*Id.*   Mayfield contends that the officer who responded to this particular grievance was Jailer Raymond, who was intimidated by the possibility of being charged with a

13

constitutional violation.   (Doc. 32 at 5).

On January 7, 2020, Mayfield submitted a grievance claiming he did not receive cleaning supplies the day before and would like to read a newspaper.   (Doc. 23-1 at 41). On January 10, 2020, Mayfield submitted a grievance about water in his cell.   *Id.* at 42. On January 12, 2020, Mayfield submitted a grievance stating it had been three days since he had cleaning supplies and forty-eight hours since he had recreation.   *Id.* at 43.   In response, he was told that all inmates in holding had been allowed to clean their cells that day.   *Id.*   Further, he was told that inmates were not allowed outside when it was under thirty-two degrees.   *Id.*

The record contains two last grievances filed by Mayfield.   One filed on January 17, 2020, claims that he had missed his opportunity for a shower because "I'm not a crack head."   *Id.* at 44.   He also asked for his hour of recreation and for cleaning supplies. Mayfield was told that no one thought he was a crack head and that recreation was not offered because it was raining and under forty-two degrees.   *Id.*   Next, on February 2, 2020, Mayfield submitted a grievance claiming that it had been three days since he had access to the cleaning cart.   *Id.* at 45.   Jailers responded that Mayfield received the cart the same day he wrote the grievance.   *Id.*

Defendants have provided an offender log report for Mayfield that lists well-being checks, headcounts, meals, and times when Mayfield was out of his cell for showers, recreation, or the law library.   *Id.* at 50–101. The log begins on November 9, 2019, when Mayfield was booked into the BCDC, and continues until January 13, 2020—a period of 66 days.   *Id.* at 60.   The log contains no records for December 6 to December 12, 2019.

14

*Id.* at 84.   According to the log, Mayfield was offered recreation seventeen times and refused to take recreation on two occasions; he went to the law library on five occasions; and he was offered a shower twenty-two times and refused on four occasions.[8]   The number of log entries per day varies significantly.   For example, there were nineteen log entries on November 13, 2019; thirty-one entries on November 25, 2019; and only sixteen entries on November 29, 2019.   *Id.* at 64, 74, 78.

The shower policy submitted by Defendants applies only to the date of admission to the BCDC.   *Id.* at 106.   The recreation policy provides that if an inmate is confined for a period of fourteen consecutive days, he "will be provided the opportunity to participate in outdoor recreation on a daily basis.   All inmates will have daily access to the dayroom areas of their living units regardless of their willingness or refusal to participate in outdoor recreation."   *Id.* at 110.   The policy notes that the opportunity for outdoor exercise is contingent upon weather and security constraints.   *Id.*

The BCDC's use-of-force policy provides that "[j]ail officers will use the minimum amount of non-deadly force necessary to maintain the security and control of inmates, and to prevent incidents from escalating into an emergency."   *Id.* at 117.   Physical restraints are only to be used when inmates are being transported "to and from the facility."   *Id.* at 121.

The BCDC's housekeeping plan provides that "[i]nmates will be responsible for

---

[8] On November 28, 2019, there are log entries indicating "to-and-from" shower times on two separate occasions.   *Id.* at 77–78.   However, it does not appear that these log entries are correct.   The first set of times spans only eleven seconds, and the second set spans only forty-two seconds, so Mayfield could not have showered in those short periods of time.   *Id.*

cleaning the inmate living areas within the facility, including: all cells, dayrooms, and inmate bathroom facilities." *Id.* at 127. Additionally, inmates are responsible for cleaning the common areas of the facility including "hallways, corridors, visiting rooms, control room and admission area." *Id.*

## II.   LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*,

550 U.S. 372, 380 (2007).

## III.    DISCUSSION

As noted above, Mayfield asserts the following claims: (1) excessive force by Jailer Raymond on two occasions; (2) failure to protect from attacks by fellow inmates and attacks by Jailer Raymond; (3) retaliation; and (4) unconstitutional conditions of confinement.   Defendants argue that Mayfield's claims fail as a matter of law, but even if the Court were to find otherwise, Defendants believe they are entitled to qualified immunity.

### A.    Excessive Force

The "objective reasonableness" standard applies to excessive-force claims brought by pretrial detainees.[9]  *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). "[T]he defendant's state of mind is not a matter that a plaintiff is required to prove."  *Id.* at 394.   A pretrial detainee "must show only that the force purposely or knowingly used against him was objectively unreasonable."  *Id.* at 396.   The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'"  *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).   "[O]bjective circumstances potentially relevant to a determination of excessive force" include:

> the reasonableness or unreasonableness of the force used; the relationship between the need for the use of force and the amount of force used; the extent of plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether plaintiff was actively resisting.

---

[9] Nothing in the summary judgment record indicates that Mayfield was in convicted status in November or December of 2019.

*Id*. (citing *Graham* 490 U.S. at 396).

This determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397. "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id*. (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). An action is objectively unreasonable if it is not reasonably related to legitimate governmental interests, such as maintaining order and security, or is excessive in relation to that objective. *Id.* at 398–99.

### 1.    Attack on November 25, 2019

In a grievance dated December 19, 2019, Mayfield contends that he was assaulted by Jailer Raymond on November 24, 2019. However, in his verified Complaint (Doc. 1) and in his verified Amended Complaint (Doc. 11), Mayfield lists the date of this alleged assault as November 25, 2019. This is also the date of the video provided to the Court. Mayfield claims that he reported the assault to Sergeants Goode and Maple, who told Chief Lewis. Mayfield further alleges that he was told that "per Chief Lewis" nothing would be done about it. *Id.* Mayfield claims the attack caused "bru[i]ses, stress & anxiety of not being able to protect myself or being able to press charges." *Id.*

The video from November 25, 2019, confirms that Mayfield was not assaulted by any officer. While there were periods of time when Mayfield's entire body was not in

view, there were multiple officers in the room with him, and their actions were consistent with strapping Mayfield into the restraint chair.   As there is no genuine issue of material fact as to whether Jailer Raymond—or any other jailer—used excessive force against Mayfield on November 25, 2019, this claim lacks merit and is subject to dismissal.

### 2.   Attack on December 7, 2019

According to the grievances Mayfield submitted on December 7, 2019, it appears Mayfield had flooded his cell in apparent protest for not having had a shower for four days, and then Jailer Raymond removed Mayfield from his cell, strapped him into the restraint chair, and placed him in the change-out room near the booking area.   Mayfield maintains that Jailer Raymond hit him in the right side of the head in the change-out room.   *Id*. Both Sergeants Goode and Maple confirm that Mayfield told them Jailer Raymond assaulted and/or threatened him.   (Docs. 23-3 at 1–2 and 23-4 at 1).   However, Sergeant Goode did not observe any bruising, scrapes, or other marks on Mayfield that would have indicated he was struck in the face.    (Doc. 23-3 at 1–2).

Jailer Raymond denies that he used any physical force against Mayfield in the change-out room.   However, he argues in the alternative that even if the Court were to assume for the sake of argument that he had used some amount of physical force on Mayfield, Jailer Raymond believes he would still be entitled to judgment in his favor, as Mayfield's injuries were no more than *de minimis*.   Jailer Raymond asserts that the physical injury requirement of 42 U.S.C. §1997e(e) would preclude Mayfield from recovering any compensatory damages related to this claim.

The Court begins its inquiry into Mayfield's excessive-force claim by examining the

19

nature of his alleged injuries and the quantum of the force used.   The absence of injury is a factor the Court considers in determining whether there was excessive force.   The Court must also keep in mind that the mere fact that injuries occurred does not support an excessive force claim if those injuries are the result of a "*de minimis* use of force." *Hunter v. Namanny*, 219 F.3d 825, 831 (8th Cir. 2000).

First, Mayfield argues that his right-hand restraint was too tight when Jailer Raymond strapped him into the restraint chair, and as a result, he could not feel his hand. In the context of the use of handcuffs, the Court of Appeals for the Eighth Circuit has made it clear that a detainee must suffer more than *de minimis* injuries to support an excessive-force claim.   *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011). This is because the use of handcuffs or other physical restraints frequently results in minor injuries to the inmate.   *Id.*   In *Crumley v. City of St. Paul*, 324 F.3d 1003, 1008 (8th Cir. 2003), the Eighth Circuit rejected an excessive-force claim when, as a result of handcuffing, the only injury shown was some bleeding.   *Id.*   The Court noted there was no evidence of "long term or permanent injury."   Thus, to the extent Mayfield's claim is based on his being handcuffed to the bench, it fails.   He has asserted nothing more than temporary, *de minimis* injury.

Second, Mayfield contends that Jailer Raymond struck him on the head while he was strapped to the restraint chair in the change-out room.   Mayfield further claims that he developed a large knot on his head and asked various jailers to examine it.   The videos documenting this period of time show that Jailer Raymond was left alone in the change-out room with Mayfield for only about twenty seconds; however, the Court cannot

20

conclude that this was not enough time for Jailer Raymond to have struck Mayfield once on the side of the head.   If the Court were to assume that the events of December 7th happened exactly as Mayfield claims, then Jailer Raymond's act of hitting Mayfield on the head would be an unreasonable and unjustified use of force.   Although Jailer Raymond denies that he ever struck Mayfield, there is no camera footage to prove otherwise, and no other witness was present in the change-out room to corroborate Jailer Raymond's story.   The Court is therefore left with directly contradictory sworn statements regarding this incident, and a genuine issue of material fact exists as to whether Jailer Raymond used excessive force against Mayfield in the change-out room.

With respect to Sergeant Goode, Sergeant Maple, and Chief Lewis, Mayfield does not contend they were present when the alleged use of force occurred.   Rather, Mayfield contends they did not properly investigate or document his report about Jailer Raymond hitting him, and as a result, these other officers violated BCDC policies. Of course, liability under § 1983 requires personal involvement.   *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).   "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendant[s], [Mayfield] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [his] constitutional rights."   *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)). Mayfield has not alleged that Sergeant Goode, Sergeant Maple, or Chief Lewis had any such personal involvement in violating his constitutional rights; he only asserts that they violated jail policies.   A failure to follow internal policies does not state a constitutional

21

violation.   *Walton v. Dawson*, 752 F.3d 1109, 1122 (8th Cir. 2019).

The Court acknowledges that a supervisory defendant may at times be liable under § 1983 if a prisoner's constitutional rights were violated as a result of a failure to properly train and/or supervise an officer.   *Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018).   To prove such liability, though, there must be a factual showing that the supervisor: "(1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing injury to [Mayfield]."   *Id.* (citations and internal quotation marks omitted).   Because there is no such evidence in this case, Sergeant Goode, Sergeant Maple, and Chief Lewis are entitled to summary judgment on the § 1983 excessive-force claim.

### 3.     Qualified Immunity

As the Court has now found that a genuine, material dispute of fact exists as to whether Jailer Raymond violated Mayfield's rights on December 7, 2019, by using excessive force, the next inquiry is whether Jailer Raymond is entitled to qualified immunity for this act.   "Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"   *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341–43 (1986)).

22

The qualified-immunity inquiry consists of two questions: "(1) whether the facts alleged or shown, construed in the light most favorable to the Plaintiff, establish a violation of a constitutional right; and (2) whether that constitutional right was clearly established as of the time of the relevant conduct such that a reasonable official would have known that his actions were unlawful."  *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (citation omitted).   The Court can answer the questions in either order.   *Pearson v. Callahan,* 555 U.S. 223, 242 (2009).   A § 1983 plaintiff may defeat qualified immunity only if the answer to both questions is "yes."   *Boude v. City of Ramore*, 855 F.3d 930, 933 (8th Cir. 2017) (citation omitted).

There is a genuine issue of fact that precludes the Court from determining whether a constitutional violation took place on December 7, 2019.   *See Wealot v. Brooks*, 865 F.3d 1119, 1125 (8th Cir. 2018) (noting courts may not resolve genuine issues of material facts under either prong); *Raines v. Counseling Assocs., Inc.,* 883 F.3d 1071, 1074–75 (8th Cir. 2018) (dismissing qualified immunity appeal for lack of jurisdiction where there was a key factual issue underlying the reasonableness of the officers' actions). If the incident in question took place exactly as Mayfield recounted, such a gratuitous use of physical force by Jailer Raymond—inflicted solely for the purpose of causing pain—would be objectively unreasonable.   Jailer Raymond is therefore not entitled to qualified immunity on this claim.

### 4.    Official Capacity

Finally, Mayfield asserts an official-capacity claim related to the December 7th incident involving Jailer Raymond.   An official-capacity claim is considered a claim

against the employing governmental entity.   *Crawford v. Van Buren Cnty.*, 678 F.3d 666, 669 (8th Cir. 2012).   "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise."   *Corwin v. City of Independence, Mo.,* 829 F.3d 695, 699 (8th Cir. 2016) (citations omitted).

Mayfield does not contend that any of the BCDC's policies are unconstitutional. Further, Mayfield points to no custom or deliberately indifferent failure to train or to supervise any BCDC officer.   Accordingly, the Court finds that Mayfield's official-capacity claim against Baxter County is subject to dismissal.

## B.     Failure to Protect[10]

### 1.     Attack by Other Inmates

Prison officials have a duty under the Eighth Amendment to protect prisoners from violence at the hands of other prisoners.   *Perkins v. Grimes,* 161 F.3d 1127, 1129 (8th Cir. 1998).   For pretrial detainees, this duty arises under the Due Process Clause of the Fourteenth Amendment.   *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007). However, the Eighth Circuit applies the Eighth Amendment elements applicable to

---

[10] Mayfield asserts only individual-liability claims in this cause of action. In his statement of undisputed facts, Mayfield contends Defendants had knowledge of the risk of danger to him posed by other inmates, based on the first attack he suffered.   (Doc. 32 at 1–2). In his Amended Complaint, Mayfield appears to assert a failure-to-protect claim based on Jailer Raymond's use of force against him.   The Court will therefore examine this claim from the standpoint of both a failure to protect Mayfield from attack by other inmates and a failure to protect him from attack by Jailer Raymond.

convicted inmates to claims brought by pretrial detainees under the Fourteenth Amendment.  *Chavero-Linares v. Smith*, 782 F.3d 1038, 1041 (8th Cir. 2015).

Not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety."  *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).   Instead, to prevail on his failure-to-protect claim, Mayfield must satisfy a two-pronged test.   He must demonstrate that: (1) he was "incarcerated under conditions posing a substantial risk of serious harm," and (2) prison officials were "deliberately indifferent [his] health or safety."   *See Holden v. Hirner,* 663 F.3d 336, 341 (8th Cir. 2011) (internal citations omitted).

The first prong of the test is an objective requirement to ensure that the alleged deprivation of the constitutional right was sufficiently serious.  *Nelson v. Shuffman*, 603 F.3d 439, 446 (8th Cir. 2010).   "The deprivation is objectively, sufficiently serious, under the first requirement when the official's failure to protect resulted in the inmate being incarcerated under conditions posing a substantial risk of serious harm."  *Id*. (internal punctuation marks and citations omitted).   The second prong, however, is subjective in that it requires proof that the official "both knew of and disregarded 'an excessive risk to inmate's health or safety.'"  *Holden*, 663 F.3d at 341 (quoting *Farmer,* 511 U.S. at 837). "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it."  *Young v. Selk,* 508 F.3d 868, 873 (8th Cir. 2007).

### a.    November 19, 2019 Attack

On November 19, 2019, Mayfield was found unconscious in the A-pod shower covered in vomit and blood.   While other inmates suggested that Mayfield tripped and

fell, Jailer Raymond felt the injuries were most likely inflicted during an attack. Mayfield's injuries were deemed serious enough to merit a visit to the hospital.   However, there is nothing in the summary judgment record suggesting there was any type of warning prior to this first attack.   Mayfield had not previously reported any threats, safety concerns, or problems with the inmates in A-pod, nor had he expressed to anyone at the jail that he believed he might be subject to attack in A-pod.   Further, there is nothing in the summary judgment record to indicate that Mayfield identified his attackers, stated who started the fight, or provided any other details about the fight to the Defendants.

Finally, there is nothing in the record showing a history of violence in A-pod, nor is there any evidence suggesting Jailer Raymond or Sergeant Goode had knowledge that Mayfield was incarcerated under conditions posing a substantial risk of serious harm. Because there is no evidence to show that any Defendant violated Mayfield's rights by failing to protect him from a surprise attack, this claim is without merit.   *See, e.g., Patterson v. Kelley*, 902 F.3d 845, 852 (8th Cir. 2018); *Webb v. Lawrence Cnty.*, 144 F.3d 1131, 1135 (8th Cir. 1998).

### b.    Placement Back in A-pod

With respect to Mayfield being placed back in A-pod after his trip to the hospital, there in nothing in the record to indicate that Jailer Raymond, Sergeant Goode, Sergeant Maple, or Chief Lewis was involved in the decision to place him there.   According to Mayfield, when he was placed back in A-pod, he asked Ryan Clark to move him up front. (Doc. 35 at 3).   Mayfield's request was granted, and he was moved to the "detox cell" at the front of the jail.   *Id.*   Though, Mayfield claims that the following morning he was

26

moved back into A-pod, Nurse Hollis countermanded that order and directed that Mayfield be moved back up front. (Doc. 23-1 at 15).

On November 27, 2019, Mayfield maintains that Jailer Julie Little, not a named Defendant, made the decision to move him back to A-pod again.   Jailer Little's notes reflect that Mayfield was threatening to kill himself if he did not go back to A-pod.   (Doc. 23-1 at 14).   He was screened by medical personnel who advised Jailer Little of Mayfield's threat.   *Id.*   Jailer Little was also advised that if Mayfield stayed in detox, he would need to be put on fifteen-minute checks.   *Id.*   Due to a shortage of personnel to conduct the fifteen-minute checks, Jailer Little made the decision to allow Mayfield to go to A-pod.   *Id.*

Mayfield does maintain that Sergeant Goode was the shift sergeant at the time of all these events; however, this fact alone does not mean he was personally involved in the decision to place Mayfield back into A-pod, and there are no facts indicating his personal involvement.   The Court concludes that there is no evidence supporting a failure-to-protect claim against the Defendants based on Mayfield being placed back in A-pod after the first attack by inmates.

### c.   November 21, 2019 Attack

As previously stated, on the morning after the first attack, Mayfield was moved from A-pod to the "detox cell" at the front of the jail.   Later, Mayfield was moved out of detox because his cellmate had a problem with him.   Jailers then made efforts to move Mayfield to H1 and H2, but those efforts proved fruitless because Mayfield claimed he would fight the inmates in those cells.   Mayfield was ultimately moved to B-pod, where

27

he was again attacked.    Following this second attack, other inmates were moved to other parts of the jail so that Mayfield could be placed in H1 by himself.

Again, nothing in the summary judgment record indicates that threats had been made against Mayfield prior to this second attack.    Mayfield had not identified any inmate in B-pod as a threat to him.    Mayfield produced no evidence on summary judgment to suggest that other fights had been occurring in B-pod prior to the second attack or that there were other surrounding circumstances from which a reasonable inference could be made that any Defendants knew of and disregarded a serious risk to Mayfield's safety prior to the attack in B-pod.    *See Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005) (finding no constitutional violation where a pretrial detainee failed to prove that he put the defendants on actual notice that he might be attacked by his cellmate).    In short, there is no evidence Defendants knew of any risk and deliberately disregarded it.    "[C]onstructive knowledge, or the 'should-have-known' standard is not sufficient to support a finding of deliberate indifference."    *Spruce v. Sargent*, 149 F.3d 783, 786 (8th Cir. 1998) (citation omitted).    For these reasons, Defendants are entitled to summary judgment on Mayfield's claims regarding attacks by fellow inmates.

## 2.    Attack by Jailer Raymond

A charge of failure-to-protect or duty-to-intervene may be premised on a detention officer's failure to intervene when another officer is using excessive force against an inmate.    *See, e.g., Krout v. Goemmer*, 583 F.3d 556, 565 (8th Cir. 2009).    To be liable, the "intervening" officer must be aware of the use of force, and the duration of the episode must be sufficient to permit an inference of tacit collaboration.    *Id.*    In other words, to

28

prevail, the prisoner must prove that he faced a substantial risk of serious harm from an officer, and the defendant officer who should have intervened both knew of the risk and failed to act.

Mayfield's first claim is that he was assaulted by Jailer Raymond on November 25, 2019, and no officer intervened to help him.   As the Court explained in its earlier discussion, the video of this incident belies Mayfield's claim and proves that no jailer assaulted Mayfield on this date.   Mayfield's second claim is that Jailer Raymond assaulted him on December 7, 2019, in the change-out room.   Mayfield does not contend that any of the other Defendants were present in the change-out room or were aware of the attack until *after* it occurred.   Thus, Sergeant Goode, Sergeant Maple, and Chief Lewis had no opportunity to intervene and are entitled to summary judgment on this claim.

### C.        Retaliation[11]

Mayfield contends that he was retaliated against for submitting grievances about his treatment at the BCDC and that this retaliation started around December 20, 2019, and continued until his release on February 7, 2020.   He alleges that Sergeant Goode, Sergeant Maple, and Chief Lewis ignored him when he asked for help in reporting or pressing charges against Jailer Raymond for his use of force on November 25th and December 7th.   Mayfield contends that when he asked for copies of his missing grievances, he was told by Sergeant Goode to ask his lawyer to get them.   Finally, Mayfield accuses Jailer Raymond of intimidating him by threatening to charge him with a major infraction in response to submitting grievances.

---

[11] Mayfield sues the Defendants only in their individual capacities on this claim.

"The filing of a prison grievance . . . is protected First Amendment activity." *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007). Filing a civil rights lawsuit is also an activity protected by the First Amendment. *Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011). "[A]ctions taken in retaliation for an inmate's [exercise of his First Amendment rights] are actionable under 42 U.S.C. § 1983." *Nelson*, 603 F.3d at 450. To establish a retaliation claim, Mayfield must prove "(1) he engaged in a protected activity, (2) [one or more of the Defendants] took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013) (quotation omitted). "This is an objective test: [t]he question is not whether the plaintiff [him]self was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014).

It is clear Mayfield reported through written grievances that Jailer Raymond used excessive force against him on November 25th and December 7th. However, the record is clear that jail officials took some sort of corrective action in response to these grievances—though not the action Mayfield preferred. It appears Jailer Raymond was counseled by his supervisors that *if such conduct occurred*, it would be a violation of the policies of the BCDC.

Victims of crime lack any legal right to compel criminal prosecution or to institute criminal prosecution. *See Diamond v. Charles,* 476 U.S. 54, 64-65 (1986); *Frison v. Zebro*, 339 F.3d 994, 998-1000 (8th Cir. 2003) (rejecting a § 1983 claim based on the

violation of a criminal statute); *In re Kaminski,* 960 F.2d 1062, 1064 (D.C. Cir. 1992) (private party lacks judicially cognizable interest in prosecution of another person). Further, there is nothing in the record to indicate that the named Defendants did anything to prevent or hinder Mayfield from contacting the prosecuting attorney.   Therefore, no actionable claim exists with regard to Defendants' alleged failure to assist Mayfield in pressing charges against Jailer Raymond.

With respect to Sergeant Goode telling Mayfield to have his attorney ask for copies of the grievances, the Court notes that Mayfield did receive copies of a number of grievances.   Mayfield contends certain grievances were missing from the copies he received.   "Inmates do not have a constitutionally protected right to a grievance procedure.   Because a . . . grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the grievance procedure is not actionable under § 1983."   *Lomholt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002) (citation omitted).   "Therefore, a prison official's failure to respond to an inmate's grievances or to return copies of those grievances to that inmate, without more, is not actionable under [§] 1983."   *Everhart v. Flournoy*, Civil No. 4:17-cv-04113, 2019 WL 2503964, at *6 (W.D. Ark. June 17, 2019).   In the case at bar, Defendants did nothing to chill Mayfield's constitutionally protected right to file grievances; thus, there was no chilling of a constitutional right.   *Eggenberger,* 820 F.3d 938 (8th Cir. 2016).

Finally, Mayfield accuses Jailer Raymond of retaliating against him by threatening to charge him with a major infraction.   This threat was allegedly made in response to a grievance filed by Mayfield on January 5, 2020, in which he asserted his Eighth

31

Amendment rights had been violated by Jailer Raymond.   The record appears to indicate that Jailer Raymond was the officer who responded in writing to this particular grievance, stating, "I hope you are not making threats toward staff, that could be considered a major infraction."   (Doc. 23-1 at 40).   After this date, Mayfield submitted other grievances complaining about his conditions of confinement, but he never mentioned Jailer Raymond or the alleged assault in any other grievance again.

"[A] threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedures."   *Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994). "The test is what a prisoner of ordinary firmness would have done in reaction to the [threatened retaliation]."   *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013). "Ultimately, this sort of question is usually best left to the judgment of a jury . . ."   *Id.*   The Court finds that a genuine issue of material fact exists as to whether Jailer Raymond threatened to charge Mayfield with a major infraction in retaliation for his exercise of his First Amendment right to file grievances about Jailer Raymond's conduct.   There is some evidence in the record that Mayfield was, in fact, intimidated by this threat and chilled from filing further grievances about the alleged assault by Jailer Raymond.   It appears the grievances he filed after this date only concerned the conditions in the jail, and he never mentioned the assault on a grievance form again.   The Court therefore finds that summary judgment as to the retaliation claim against Jailer Raymond should be denied. There is no evidence of retaliation by any other Defendant.

Since a genuine issue of material fact precludes the Court from determining whether Jailer Raymond retaliated against Mayfield for exercising his First Amendment

right to file grievances, no qualified immunity is available.   *See Wealot v. Brooks*, 865 F.3d 1119, 1125 (8th Cir. 2018) (noting courts may not resolve genuine issues of material facts under either of the two qualified-immunity prongs).

### D.   Unconstitutional Conditions of Confinement

#### 1.   Individual-Capacity Claims

In *Stearns v. Inmate Servs. Corp., et al.,* 957 F.3d 902 (8th Cir. 2020), the Eighth Circuit ruled that the deliberate-indifference standard did not apply to conditions-of-confinement cases brought by pretrial detainees. The Eighth Circuit clarified that the claims of pretrial detainees must be analyzed under the Fourteenth Amendment as set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979).   In *Bell,* the Court stated that "the proper inquiry is whether [the] conditions amount to punishment of the detainee."   *Id.,* 441 U.S. at 535.

The Eighth Circuit in *Stearns* stated:

> In *Bell v. Wolfish*, the Supreme Court articulated the standard governing pretrial detainees' claims related to conditions of confinement.   The Court held that the government may detain defendants pretrial and "may subject [them] to the restrictions and conditions of [a] detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution."   *Id*. at 536–37.   The Court articulated two ways to determine whether conditions rise to the level of punishment.   A plaintiff could show that the conditions were intentionally punitive. *Id*. at 538. Alternatively, if there is no expressly demonstrated intent to punish, the plaintiff could also show that the conditions were not reasonably related to a legitimate governmental purpose or were excessive in relation to that purpose.   *Id*. at 538–39.   If conditions are found to be arbitrary or excessive, it is permissible to "infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees."   *Id*. at 539.

*Stearns*, 957 F.3d at 907 (alterations in original) (citations to the Supreme Court Reporter omitted). In sum, the Constitution prohibits conditions that are intentionally punitive, are not reasonably related to a legitimate governmental purpose, or are excessive in relation to that purpose.  *Id.*  The Court must view the facts in the light most favorable to Mayfield and determine whether there is a jury issue as to whether his conditions of confinement amounted to punishment.  *Id.* at 908–09.

Mayfield submitted the following grievances regarding his conditions of confinement:

11-21-2019  No access to running water or toilet.   (Doc 23-1 at 14). [12]

11-23-2019  No recreation or newspaper for six days; have to beg for shower and medications; no sunlight for six days.  *Id.* at 24. [13]

11-26-2019  Only had recreation once in seven days; have to beg for recreation; no sunlight; I have rights to have an hour out.  *Id.* at 25.

11-26-2019  It took six days to get cleaning supplies.  *Id.* at 26.

12-07-2019  Flooded my cell because I had not had a shower in four days.  *Id.* at 27.

---

[12] In his Amended Complaint, Mayfield alleged these conditions lasted for three days. Defendants admit there were plumbing problems during this time. However, they maintain the water was turned off "only long enough to fix the problem" and never for three days.

[13] In his Response, Mayfield indicated he was generally allowed a shower every three days while he was in isolation.   However, "[e]very once in a while 4 to 5 days."   (Doc. 26 at 3).   In isolation, Mayfield was only offered a cleaning cart every once in a while, and usually between the hours of 6 p.m. and 1 a.m.  *Id.*  When he was in population, he was able to shower every day.  *Id.*  He was also provided a cleaning cart every day while in population. *Id.*  Mayfield asserts that there was a drastic difference between the opportunities he had to shower, clean, etc., while in isolation compared to when he was in population.  *Id.*  The Eighth Circuit has held that isolation or lockdown serves legitimate governmental purposes of maintaining the ongoing safety and order in a jail facility.  *Bartunek v. Hall Cnty., Neb.,* 828 F. App'x 340, 341 (8th Cir. 2020).

| 1-04-2020 | Asked for cleaning supplies both shifts and did not get them; medication was late; not allowed access to law library on either shift.   *Id.* at 39. |
| --- | --- |
| 1-07-2020 | Did not receive cleaning supplies on January 6, 2020, despite having asked both shifts; would like to read the newspaper for a change—it disappears.   *Id.* at 41. |
| 1-10-2020 | There is a lot of water in my cell.   It might be condensation. *Id.* at 42. |
| 1-12-2020 | No cleaning supplies in three days; no recreation in two days. *Id.* at 43. |
| 1-17-2020 | Missed my shower opportunity; can we be allowed our one hour out and cleaning supplies?   *Id.* at 44. |
| 2-02-2020 | Three days since we have had a cleaning cart.   *Id.* at 45. |

Mayfield also alleged in his Amended Complaint that the light in his cell was turned on throughout the night and that he was given a plunger to flush his toilet.   (Doc. 11 at 6).   Defendants admit the lights were turned on throughout the night in the detox cell and the holding cells but only long enough to confirm the detainee was present.   *See, e.g.,* Doc. 23-1 at 3.   Defendants also admit that inmates were sometimes given a plunger to unclog a toilet.   *Id.*   However, according to Defendants this only occurred when the detainee had clogged the toilet himself.   *Id.*

As was made clear in *Bell*, the Due Process Clause is only implicated when a detainee is forced "to endure genuine privations and hardship over an extended period of time."   *Bell*, 441 U.S. at 542.   All incarceration brings about significant restrictions and changes in living conditions not endured by those living in the free world.   The Court does not believe that relatively short, sporadic deprivations of cleaning supplies, recreation,

35

showers, access to the newspaper, receiving medication late (on a single occasion), or not being allowed to use the law library on the day requested constitute punishment.[14] The longest deprivations alleged were seven days without recreation, six days without cleaning supplies and the newspaper, and four days without a shower.   While these conditions were no doubt unpleasant, the Court does not believe a genuine issue of material fact exists as to whether they violated the Constitution.   This claim will therefore be dismissed.

## 2.    Official Capacity

As no County employees are liable for violating Mayfield's constitutional rights on his conditions-of-confinement claim, no official-capacity claim is cognizable.

## IV.    CONCLUSION

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 21) is **GRANTED IN PART AND DENIED IN PART.**   All claims in the case are dismissed except the following against Jailer Raymond in his individual capacity:   (1) the excessive force claim stemming from his alleged use of force against Mayfield on December 7, 2019; and (2) the retaliation claim.   All other Defendants are **DISMISSED** from the case.   The matter will be set for trial by separate order.

---

[14] Although in one grievance Mayfield maintains that he did not have access to running water in his cell, he does not claim he did not have water to drink or was unable to use a toilet and shower elsewhere in the facility.   Further, none of his other grievances mention the unavailability of running water.

**IT IS SO ORDERED** on this 29th day of December, 2020.

_____
TIMOTHY L. BROOKS
UNITED STATES JUDGE